# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CAMERON KNUCKLES | : | |
| Plaintiff | : | |
| v | : | Civil Action No. RWT-08-723 |
| GARY D. MAYNARD, *et al.*, | : | |
| Defendants | : | |

o0o

## MEMORANDUM OPINION

Pending are Defendants' Motion to Dismiss or for Summary Judgment [ECF No. 13], Plaintiff's Motion for Summary Judgment [ECF No. 17], and the responses and replies thereto. In addition, Plaintiff has filed a motion for appointment of counsel [ECF No. 38]. The case is ripe for dispositive review. Upon review of the papers filed, the court finds a hearing in this matter unnecessary. See Local Rule 105.6 (D. Md. 2010). For the reasons that follow, Defendants' motion, construed as a Motion for Summary Judgment, shall be granted and Plaintiff's motions shall be denied.

### Background

Plaintiff alleges he was transferred to the Special Management Unit (SMU) at North Branch Correctional Institution (NBCI) on July 18, 2007, without benefit of notice or a hearing. ECF No. 1 at p. 5. He states he was not told why he was being transferred and was not charged with a rule violation. Id. Upon his arrival in the SMU, Plaintiff was given a yellow manual explaining the levels program, defined as a disciplinary segregation level program. Id.

Plaintiff claims he was not given a hearing until he was taken before a Disciplinary Levels

Program Committee on August 7 or 8, 2007, at which time Lieutenant Thomas explained to Plaintiff that he was "sentenced to disciplinary segregation" but would remain assigned to administrative segregation indefinitely unless he elected to participate in the Quality of Life (QOL) program. Id. at pp. 5-6. Plaintiff claims he asked what he had done wrong and he was told he participated in security threat activities. Id. Specifically, Plaintiff was accused of participating in an assault on behalf of the gang known as the Bloods. Plaintiff denied participating in an assault and denied being a member of the Bloods.[1] Id. at p. 6. Plaintiff alleges that his administrative complaint was dismissed by the Inmate Grievance Office (IGO). Id. at p. 5.

The complaint centered on Plaintiff's transfer to the SMU of NBCI on or about July 18, 2007, where he was placed in segregated confinement without benefit of notice or a hearing. Id. Plaintiff claims that the conditions at SMU included 24 hour cell-restriction with only one hour for recreation each week, during which Plaintiff was taken to an outdoor recreation cage once a week, restrained with leg irons, handcuffs, a black box, and a waist chain. Id. at p. 6. While restrained in this fashion, Plaintiff claims he can barely move. Id. Plaintiff states SMU inmates are not allowed visits, phone calls or programming, nor are they allowed access to a law library or assignments to prison jobs. Id. Plaintiff further claims that even though he was 17 years old and educational programming was mandatory for him, he was not assigned to any educational programs while in the SMU. Id. Plaintiff claims that his indefinite assignment to the SMU, combined with his inability

---
[1] Plaintiff states he filed an Administrative Remedy Procedure (ARP) complaint, but was told he could not use the ARP process to challenge classification decisions. He states he then submitted a complaint to the Inmate Grievance Office (IGO), but the complaint was dismissed after pending for six months. ECF No. 1 at p. 6.

2

to earn diminution credits or participate in programming, will adversely affect his chances for parole.[2]  Id.

Defendants assert that Plaintiff was assigned to the SMU at NBCI because he had been identified as a high ranking member of the Treetop PIRU Bloods gang[3] and was suspected of participating in a mass disturbance at Western Correctional Institution (WCI).[4]  ECF No. 13 at Ex. 1, p. 8.  Plaintiff was first transferred from Maryland Correctional Training Center ("MCTC") to NBCI on June 8, 2007.  Id. at p. 3.  On July 15, 2007, after being identified as potentially involved in an altercation in the big yard at the WCI on July 14, 2007, Plaintiff was placed on administrative segregation pending a review of the circumstances and case management team action.  Id. at p. 7.  On July 25, 2007, Plaintiff was identified as a candidate for housing in NBCI's SMU and placement in the Quality of Life (QOL) Program after the incident was determined to be possibly gang related.  Id.  On August 16, 2007, Plaintiff was placed in the QOL program after being identified as an influential gang member and after the Warden's designee affirmed the recommendation of the QOL committee.[5]  Id. at p. 8.

---

[2] Plaintiff is serving a 50 year sentence from 2005 for first degree murder, second degree murder, kidnapping, extortion, and handgun offenses. See ECF No. 13 at Ex. 1, p. 4.

[3] To substantiate their claim that Plaintiff is a gang member, Defendants state Plaintiff signs his mail "General Killa," which signifies his position of authority in the gang.  ECF No. 13 at Ex. 1, p. 3.  Defendants further claim that in correspondence dated October 2006, Plaintiff ordered a hit on a person who testified against one of his friends.  The correspondence contained a threat wherein Plaintiff stated that he knew where the witness and his girlfriend "lay their heads."  Id.  Although much of the information linking Plaintiff with gang activity was discovered in October 2006, he was not transferred from MCTC to NBCI until June 8, 2007; and he was not assigned to administrative segregation until July 14, 2007, when he was suspected of participating in an altercation in the yard of Western Correctional Institution (WCI).  Id. at p. 40.

[4] Defendants explain that prior to the official opening of NBCI, two of the housing units were referred to as WCI housing units # 6 and 7.  ECF No. 13 at p. 8, fn. 4.

[5] The QOL committee consisted of a chief psychologist, psychology associate, social worker, case manager,

The SMU QOL program officially started in May 2007. Id. at Exhibit 2, p. 6. Defendants explain that the program targets inmates who exhibit behavior that is a threat to the security of the institution, or who have influenced others to engage in such behavior.[6] Id. at p. 7. The alleged behavior must be supported with documentation. Id. at p. 6. However, in July 2007, several incidents of gang violence resulted in a number of inmates transferred to NBCI under emergency conditions, with little to no documentation to support the allegation of their threat to the security of the institution. Id. at Exhibit 1, pp. 4, 5. Prior to being transferred to the SMU, a form for each inmate was supposed to be filled out by the sending institution and approved by the regional Assistant Commissioner and the Assistant Commissioner for Programming. Id. at Exhibit 2, p. 6. This approval process was not done for the approximately 90 emergency transfers, and was only initiated by NBCI staff after their arrival. Id. Review of all of the inmates was completed in October of 2007 and resulted in 42 participants being discharged from the program due to lack of supporting documentation. Id. During a subsequent rescreening process, approximately 40% of the participants were discharged from the program due to the lack of documentation. Id. at p. 7.

The SMU QOL program consists of the intake level and Levels 1-5. Id. at p. 9. The intake level is the most restrictive; inmates are permitted two showers per week, one day of recreation in three-piece restraints per week, and no visits except legal or clergy. Id. Inmates are required to stay at this level until they: (1) complete and turn in the program pre-test to move to Level 1; and (2) give

---

intelligence officer, housing unit sergeants from two day time shifts, housing unit manager, designated correctional officer, and the program historian. ECF No. 13 at p. 8, fn. 5.

[6] The QOL committee consisted of a chief psychologist, psychology associate, social worker, case manager, intelligence officer, housing unit sergeants from two day time shifts, housing unit manager, designated correctional officer, and the program historian. ECF No. 13 at p. 8, fn. 5.

a verbal commitment to participate in the program. Id. Levels 1 through 5 feature increased privileges and behavioral expectations. Id. Defendants assert that participants were never forced to participate in the program; however, until March 2008, refusal to participate meant that the participant remained at the intake level of the program until they elected to participate. Id. at Ex. 2, p. 6.

Plaintiff underwent his first QOL evaluation and discussion of his Behavioral Management Plan (BMP) on August 14, 2007, the same day he was admitted to the QOL/Levels program after being identified as an influential gang member. Id. at Ex 1, p. 8. At the completion of the meeting, Plaintiff refused to sign the plan. Id. at p. 9. Because he refused to sign the plan and participate in the program, he was kept at the intake level, the most restrictive of the six levels in the program. Id. Between August 2007 and May 2008, Plaintiff moved from the intake level of the program up to level three. Id.

In approximately March 2008, the Assistant Commissioner of Correction reviewed the mandatory status of the program and made the program voluntary. Id. at p. 7. NBCI case management then spoke with each program participant and gave him the option to remain in or opt out. Id. Inmates electing not to participate in the program were assigned to administrative segregation and received all of the rights and privileges of administrative segregation. Id. On June 17, 2008, Plaintiff signed an informed consent opting out of the QOL program. Id. at p. 9. Plaintiff remained classified as a disciplinary segregation inmate until completion of his disciplinary segregation term, scheduled to end on June 26, 2008.

Upon completion of his disciplinary segregation term, Plaintiff was classified as administrative segregation. Id. An inmate assigned to administrative segregation is reviewed by case management at least once every 30 days and, in the course of each review, case management is to consider available alternatives to continued administrative segregation. Id. Although Plaintiff claims that at some point he no longer received 30 day reviews [ECF No. 17 at p. 15], on February 2, 2009, Plaintiff received an administrative segregation review and NBCI case management personnel determined he should be removed from administrative segregation and reassigned to general population. ECF No. 30.

**Analysis**

**I.  Plaintiff's Motion for Appointment of Counsel**

Plaintiff filed a Motion for Appointment of Counsel. ECF No. 38. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1)[7] is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. See Cook v. Bounds, 518 F.2d 779 (4th Cir. 1975); see also, Branch v. Cole, 686 F.2d 264 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984). Where a colorable claim exists but the litigant has no capacity to present it, counsel should be appointed. Id.

Upon careful consideration of the motions and previous filings by Plaintiff, the Court finds

---

[7] Under § 1915(e)(1), a court of the United States may request an attorney to represent any person unable to afford counsel.

that he has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending are not unduly complicated and there are no exceptional circumstances that would warrant the appointment of an attorney to represent Plaintiff under §1915(e)(1). Accordingly, his motion shall be denied.

## II. Motion for Summary Judgment

### Standard of Review

Summary Judgment is governed by Fed. R. Civ. P. 56(c) which provides that:

> [Summary judgment] should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia

Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986))

**Mootness**

Defendants assert that Plaintiff's complaint is now moot because he is no longer assigned to administrative segregation. ECF No. 30. They note Plaintiff was reassigned to general population at NBCI after he completed a "non-BMP cognitive program 'taking a Chance on Change'" and had remained infraction free for six months. Id. at Ex. 1. It was further noted that Plaintiff did not give custody staff any problems and the Intelligence Department had no new information implicating Plaintiff in gang-related activity. Id. Plaintiff refutes the assertion that his claim is moot, stating that he spent 605 days on administrative segregation without benefit of due process protections, entitling him to damages. ECF No. 33.

A claim is moot when there is no longer a case or controversy to be determined by the court. "This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990). The parties must continue to have a "personal stake in the outcome" of the lawsuit. Id. at 478 (quoting Los Angeles v. Lyons, 461 U.S. 95, 101 (1983)). "This means that, throughout the litigation, the plaintiff 'must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer, 523 U.S. at 7 (quoting Lewis, 494 U.S. at 477). To the extent that Plaintiff was seeking injunctive relief, the claim was moot when he was released from

administrative segregation and reassigned to general population. His claim for damages for the past wrong alleged, however, is not moot. That claim is analyzed below.

**Due Process**

In the prison context there are two different types of constitutionally protected liberty interests which may be created by government action. The first occurs when there is a state- created entitlement to an early release from incarceration. See Board of Pardons v. Allen, 482 U.S. 369, 381 (1987) (state created liberty interest in parole); Wolff v. McDonnell, 418 U. S. 539, 557 (1974) (state created liberty interest in good conduct credits). The second type of liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U. S. 472, 484 (1995).

Plaintiff's transfer on June 8, 2007, was a transfer from MCTC to NBCI with no change in his security assignment level. ECF No. 26 at p. 7. Plaintiff's security level was "Medium I" when he was moved to NBCI, and remained at that level until January 2, 2008, when it was increased to "Maximum I" after he was found guilty of assaulting an officer and an inmate in two separate incidents. ECF No. 13 at Ex. 1, pp. 20-21. Plaintiff was not entitled to notice and an opportunity to be heard prior to his transfer on June 8, 2007; the mere transfer of a prisoner from one facility to another does not create a liberty interest. See Meachum v. Fano, 427 U.S. 215 (1976).

Plaintiff was transferred to administrative segregation at NBCI on July 15, 2007 after WCI personnel determined that he was an active, high ranking member of the Bloods gang, and was suspected of participating in a mass disturbance at WCI. On August, 14, 2007, Plaintiff was

9

admitted to the QOL program in NBCI's SMU, after it was determined that he had engaged in conduct that posed a threat to the security of the institution. This court must determine if the conditions under which he was confined while in the QOL program at NBCI's SMU exceed the scope of Plaintiff's sentence and constituted an atypical and significant hardship. See Sandin, 515 U.S. at 484.

The parties agree that the intake level of the QOL program at SMU is significantly more restrictive than administrative segregation. Indeed, this Court has found that "the description of the permitted activities at the intake level, together with the initially mandatory nature of the program, approaches the type of conditions this Court has found to invoke a protected liberty interest." See Scott v. Maynard, et al., No. 8:07-cv-03080-AW (D. Md. Dec. 9, 2008); aff'd 347 Fed.Appx. 961, 2009 WL 3403283 (4th Cir. 2009) (transfer to QOL Program at NBCI did not implicate a liberty interest); compare, with Farmer v. Kavanaugh, 494, F. Supp. 2d 345 (D. Md. 2007) (transfer to Maryland Correctional Adjustment Center is a hardship as compared to conditions at other facilities). However, as noted in Scott, there is "a significant difference in the institutional assignment described in Farmer and Plaintiff's transfer to the levels program at NBCI [sic] where the length of stay in the program is to some extent in the hands of the inmate participant." See No. 8:07-cv-03080-AW. The parties have not produced any evidence to suggest that the program requirements are impossible to fulfill or are somehow detrimental to Plaintiff's health. To the contrary, in this case Plaintiff has himself demonstrated the ability of inmates to move forward to earn more privileges based on behavior and participation. See ECF No 13, at Ex. 1, p. 8 (from

10

August 2007 – May 2008, Plaintiff moved from the intake level of the program up to level three); See also ECF No. 30, at Ex. 1 (Plaintiff was reassigned to general population on February 2, 2009, after he completed a non-BMP cognitive program).

Plaintiff claims he was more isolated at SMU but admits he was permitted visits. See ECF No. 17, at p. 22. Plaintiff does not deny being provided a review hearing after his transfer to NBCI, and admits that NBCI personnel advised him that he was placed in segregated confinement because he participated in security threat activities and was believed to be involved with an assault for the Bloods gang. See ECF No 1, at pp. 5-6. Although, Plaintiff denies being a gang member and denies any involvement in any assault, the supplemental materials provided by Defendants indicate that Plaintiff was an active member of the Bloods prior to being assigned to the QOL program at SMU.

Plaintiff's claim that his lack of participation in programming and institutional job assignments adversely affects his eligibility for parole lacks evidentiary support. First, Plaintiff's assignment to the SMU did not render him ineligible for parole for the duration of his stay. Second, Plaintiff's lengthy sentence for violent offenses, coupled with the short amount of time he has served, his poor institutional adjustment, and his gang affiliation, are factors weighing against his suitability for parole. Third, given Plaintiff's poor institutional record, it is impossible to discern whether a similar effect on his ability to participate in programming and earn diminution credits would have occurred without the assignment to the SMU. Thus, the Court does not find Plaintiff's assertions regarding parole eligibility persuasive. Taking Plaintiff's description of restrictive conditions at SMU as true, the Court finds that they are not atypical conditions that would invoke

due process protections. Plaintiff has failed to establish that he had a protected liberty interest under Sandin.

The conditions present in the SMU are not "synonymous with extreme isolation" and Plaintiff has not been deprived of almost all environmental or sensory stimuli or of all human contact. See Wilkinson v. Austin, 545 U.S. 209, 223 (2005). The court is mindful that "it must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards when correctional officials conclude that a prisoner has engaged in disruptive behavior." Id. at 228. In this case, Plaintiff was assigned to the QOL program in the SMU because he was believed to be an active, high ranking member of the Bloods gang.

### Eighth Amendment Claim

To the extent Plaintiff alleges he was subjected to cruel and unusual punishment as a result of the 605 days of confinement in the SMU, his claim fails. Routine discomfort is part of prison life. See Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996) (citing Hudson v. McMillian, 503 U.S. 1, 8-9 (1992)). "[T]o withstand summary judgment on an Eighth Amendment challenge to prison conditions a plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993). Notwithstanding the isolation Plaintiff suffered in the SMU and his allegations that he lost opportunities for programming, there is no evidence that he suffered serious or significant physical or emotional injury as a result of his confinement. Defendants are therefore entitled to summary judgment on any Eighth Amendment claim.

12

<u>Mandated Educational Assignment</u>

Plaintiff asserts his removal from school when he was assigned to administrative segregation was improper because he was only seventeen-years-old at the time. ECF No. 1. To the extent Plaintiff is seeking to assert a state law claim, he has failed to allege facts sufficient to support such a claim. Under Maryland law, "each child who resides in this State and is 5 years old or older and under 16 shall attend a public school." Md. Educ. Code Ann. §7-301(a)(1). At the time Plaintiff was assigned to administrative segregation, he was seventeen-years-old and his mandatory education was completed. This claim must be dismissed as it lacks merit.

**Conclusion**

In light of the above analysis, Defendants' Motion to Dismiss or for Summary Judgment, construed as a Motion for Summary Judgment, shall be granted. Plaintiff's Cross-Motion for Summary Judgment and his Motion for Appointment of Counsel shall be denied. A separate Order follows.

<u>October 29, 2010</u>　　　　　　　　　　　　　　　　　　　　　　　/s/
Date　　　　　　　　　　　　　　　　　　　　　　　ROGER W. TITUS
　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE